IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TRESSA SHERROD, et al.,

     Plaintiffs,

     v.

OFFICER SEAN C. WILLIAMS, et al.,

     Defendants.

:

:

:

:

Case No. 3:14-cv-454

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING
IN PART MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
OFFICER SEAN C. WILLIAMS, SGT. DAVID M. DARKOW, CHIEF
DENNIS EVERS, AND THE CITY OF BEAVERCREEK, OHIO (DOC.
#129); OVERRULING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOC. #169); DISMISSING ALL CLAIMS
AGAINST SGT. DAVID M. DARKOW WITH PREJUDICE; DIRECTING
PLAINTIFFS TO SHOW CAUSE WITHIN 10 DAYS WHY THE § 1983
CLAIMS BASED ON ALLEGED VIOLATIONS OF CRAWFORD'S
FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS SHOULD NOT
BE DISMISSED WITH PREJUDICE

---

John H. Crawford, III ("Crawford" or "Decedent"), was shot and killed by

Beavercreek Police Officer Sean C. Williams ("Williams"), who was responding to

a report that a man was pointing a loaded gun at people inside the Beavercreek

Wal-Mart store. The Executrix of Crawford's Estate, Tressa Sherrod, together with

John Crawford, Jr. (Decedent's father), and LeeCee Johnson (the mother of

Decedent's two minor children), filed suit against Officer Williams, Beavercreek

Police Sergeant David M. Darkow ("Darkow"), Beavercreek Police Chief Dennis

Evers ("Evers") and the City of Beavercreek (collectively, "the Beavercreek Defendants").

Plaintiffs asserted ten causes of action against various combinations of the Beavercreek Defendants: (1) Assault and Battery against Williams and Darkow; (2) Negligence, Gross Negligence and Recklessness against Williams and Darkow; (3) Negligent Training and Supervision against Evers and Beavercreek; (4) Negligence, Gross Negligence and Recklessness against Evers and Beavercreek; (5) Unreasonable Use of Excessive Force against the Beavercreek Defendants; (6) Intentional Infliction of Emotional Distress against the Beavercreek Defendants; (7) Negligent Infliction of Emotional Distress against the Beavercreek Defendants; (8) Violation of Constitutionally-Protected Right to Be Free from Unreasonable Seizure, Excessive Use of Force and Other Rights Protected by the Constitutions of Ohio and the United States of America (Claims for Violation of 42 U.S.C. § 1983 against the Beavercreek Defendants); (9) 42 U.S.C. § 1983 Wrongful Death against the Beavercreek Defendants; and (10) 42 U.S.C. § 1983 Survival Action against the Beavercreek Defendants.

Plaintiffs also filed suit against Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, and Walmart Store #2124 (collectively, "the Wal-Mart Defendants"), asserting claims of Negligence and Premises Liability (Counts 11 and 12). These claims against the Wal-Mart Defendants are the subject of a separate motion for summary judgment, which is not yet fully briefed.

In addition, Plaintiffs brought claims of Survivorship, Wrongful Death and Loss of Consortium against the Beavercreek Defendants and the Wal-Mart Defendants (Counts 13-17).

This matter is currently before the Court on the Beavercreek Defendants' Motion for Summary Judgment, Doc. #129, and on Plaintiffs' Motion for Partial Summary Judgment as to certain claims against Officer Sean Williams, Chief Dennis Evers, and the City of Beavercreek, Doc. #169.

## I.    Background and Procedural History

On the evening of August 5, 2014, John H. Crawford, III, was shopping at the Wal-Mart Store located in Beavercreek, Ohio. He picked up an unloaded MK-177 BB/pellet rifle in the sporting goods department and made his way across the store to the pet department.

Ronald Ritchie, another Wal-Mart shopper, spotted Crawford with the pellet rifle. At approximately 8:22 p.m., Ritchie called 911 and reported that a black male, about six feet tall, wearing a blue shirt and blue pants, was "walking around with a gun in the store." He said that it appeared to be a rifle. According to Ritchie, the man was in the pet department talking on his cell phone. Ritchie told the dispatcher that the man was waving the gun around and "pointing at things." At one point, Ritchie indicated that the man was trying to load the gun and had pointed it at two children. Doc. #122-1, PageID##2837-44.

The 911 dispatcher directed two officers to respond to Wal-Mart on the weapons complaint. Beavercreek Police Officer Sean C. Williams was already behind the store completing paperwork from a traffic crash, so he drove to the front of the store. Doc. #121, PageID#2458. He could hear sirens in the background; as a result, he decided to wait for the next officer to arrive. Doc. #121-1, PageID#2503. Sergeant David Darkow arrived about one minute later. Doc. #121, PageID#2496. Williams was wearing a police badge, cargo shorts and a shirt bearing the word "Police." *Id.* at PageID##2459-60. Darkow was wearing a tactical vest, cargo pants, a police badge and a uniform shirt with the word "Police." Doc. #134, PageID#2983.

As Williams and Darkow entered the store, nothing appeared to be amiss. They heard no gunshots and no screaming or shouting. They saw no one who was injured, and no one was running out of the store in a panic. Doc. #121, PageID#2469; Doc. #134, PageID##2946-47. On the way in, Darkow told the Wal-Mart greeter to take cover. Doc. #134, PageID##2989-90. Williams may have asked a customer or two if they had seen anyone with a gun; they responded that they had not. Doc. #121, PageID#2445.

The officers made their way to the pet department, looking down each aisle for the suspect. No one else was in the pet department at the time. Sergeant Darkow spotted Crawford standing alone in the last aisle. Doc. #134, PageID#2947. Crawford, who matched the description given by the 911 caller, was looking at the shelves, with his left side facing Darkow. *Id.* at PageID#2948-

4

49, 2961. Darkow saw Crawford holding the gun in his right hand, pointed to where the shelving unit connected to the floor. *Id.* at PageID#2949. Darkow did not notice that Crawford was talking on his cell phone, which he held up to his left ear with his left hand. Darkow believed that Crawford had both hands on the gun, which Darkow believed to be a .223 caliber AR-style rifle. *Id.* at PageID##2950, 2961.

Darkow, who had his gun drawn, positioned himself behind a pallet of kitty litter. He did not identify himself as a police officer. He yelled at Crawford, "Drop the gun! Get on the ground!" Crawford turned his head toward Darkow. *Id.* at PageID#2953. According to Darkow, Crawford was noticeably shocked and startled. *Id.* at PageID#2953-56. Crawford did not drop the gun or get on the ground. Instead, he crouched slightly, flexing his knees. It appeared to Darkow that Crawford was going to turn away from him and take cover behind the endcap of the shelving unit.[1] *Id.* at PageID##2955-56.

Williams, who had been covering Darkow and checking the aisle in the opposite direction, spun around and raised his gun when he heard Darkow yell at Crawford. Doc. #121, PageID#2444, 2459. Williams was standing to Darkow's right, slightly behind him. Doc. #134, PageID#2978. Williams verified that the suspect matched the description given by the 911 caller. Doc. #121, PageID#2445. He noted that Crawford's rifle, which was pointed down at about a

---

[1]  An endcap is a product display that is placed at the end of an aisle.

45-degree angle, looked genuine and it appeared to be loaded. *Id.* at

PageID##2439, 2441. As with Darkow, Williams did not notice that Crawford

was talking on his cell phone, despite the fact that Crawford was holding it in the

hand closest to the officers. *Id.* at PageID#2440.

Williams testified that when he first saw Crawford, Crawford was turned

slightly toward them and his knees were flexed. *Id.* at PageID#2441. Williams

maintains that Crawford took an aggressive stance and was about to point the gun

at them. *Id.* at PageID##2440, 2444-45, 2459. Williams quickly fired two shots,

striking Crawford, who collapsed. The first shot was fired approximately 1.5

seconds after Darkow first began to command Crawford to drop the gun. The

second shot was fired .32 seconds later. Doc. #165, PageID#10852. Crawford

was transported to the hospital alive, but was pronounced dead at 9:23 that same

evening. Doc. #173, PageID#12017.

On December 16, 2014, Tressa Sherrod, the Executrix of Crawford's estate,

along with Crawford's father and the mother of Crawford's two minor sons, filed

suit against the Beavercreek Defendants and the Wal-Mart Defendants, asserting

seventeen causes of action. Doc. #1. The Beavercreek Defendants have moved

for summary judgment on all claims against them. Doc. #129.

Plaintiffs have moved for partial summary judgment on some of the claims

asserted against the Beavercreek Defendants. More specifically, Plaintiffs seek

summary judgment on the § 1983 claims against Williams, Evers and the City, and

on the state law claims of battery,[2] intentional infliction of emotional distress,

survivorship and wrongful death. Doc. #169.


## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.

v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial

responsibility of informing the court of the basis for its motion, and identifying

those portions of the record which it believes demonstrate the absence of a

genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d

1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241,

1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986). Once the burden of production has so shifted, the party opposing

summary judgment cannot rest on its pleadings or merely reassert its previous

allegations. It is not sufficient to "simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

---

[2]    Although the Complaint asserts a claim of assault and battery, Plaintiffs seek
summary judgment only on the battery claim.

475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S.

1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." *Id.* (citations omitted).


## III.    Analysis

Plaintiffs have brought a variety of federal and state claims against the Beavercreek Defendants. The Court turns first to the federal claims seeking damages under 42 U.S.C. § 1983.

### A.    42 U.S.C. § 1983 Claims (Counts Eight, Nine and Ten)

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In order to recover damages under § 1983, a plaintiff must prove that a defendant, while acting under color of state law, violated rights

9

secured by the Constitution or laws of the United States. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

In this case, it appears to be undisputed that Officer Williams, Sergeant Darkow and Chief Evers were acting under color of state law when they engaged in the conduct that gave rise to Plaintiffs' claims. At issue is whether they violated Crawford's constitutional rights.

The Complaint alleges several constitutional violations. Count Eight of the Complaint alleges that the Beavercreek Defendants violated Crawford's Fourth Amendment rights by subjecting him to an objectively unreasonable use of force. Count Eight also alleges that the Beavercreek Defendants violated Crawford's Sixth and Eighth Amendment rights by subjecting him to punishment without the benefit of a trial by jury, and his Fifth Amendment rights by depriving him of his liberty without due process of law. Doc. #1, PageID#17. The briefs filed in connection with the summary judgment motions do not address the alleged violations of the Fifth, Sixth or Eighth Amendments.

It appears, however, that these other constitutional claims are meritless. "[T]he Fifth Amendment's Due Process Clause circumscribes only the action[s] of the federal government." *Scott v. Clay Cty.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000). No federal actors are named in the Complaint. The Sixth Amendment applies only to criminal prosecutions, and the Eighth Amendment applies only to convicted prisoners. Given that Crawford was not charged with a crime, and there is no indication that Williams shot Crawford with the intent to punish him for a

crime, these Amendments also appear to be inapplicable. *See Tennessee v. Garner*, 471 U.S. 1, 29 (1985) (O'Connor, J., dissenting) (finding no cognizable Sixth Amendment or Eighth Amendment claim by a suspect who is shot while trying to avoid apprehension).

Accordingly, Plaintiffs are directed to SHOW CAUSE, within 10 days of the date of this Decision and Entry, why the claimed violations of Crawford's Fifth, Sixth and Eighth Amendment rights should not be dismissed with prejudice. In the meantime, the Court will limit its discussion of the § 1983 claims, as did the parties, to the alleged violation of Crawford's Fourth Amendment right to be free from unreasonable seizure, as applied to the States through the Fourteenth Amendment. *See Elkins v. United States*, 364 U.S. 206, 213 (1960). Plaintiffs have alleged that, in shooting and killing John Crawford, the Beavercreek Defendants violated Crawford's Fourth Amendment right to be free from the use of excessive force.

### 1. Claims Against Officer Williams, Sergeant Darkow and Chief Evers

Williams, Darkow and Evers were each sued individually and in their official capacities as employees of the City of Beavercreek. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159 (1985), an individual-capacity suit seeks to impose personal liability on a government official for actions taken under color of state law. An official-capacity suit, however, is the equivalent of an action against the governmental entity of which the officer is an agent. *Id.* at 165.

11

### a. Official Capacity Claims

Given that the City of Beavercreek has also been named as a defendant in this lawsuit, the claims brought against Williams, Darkow and Evers in their official capacities are superfluous and will be DISMISSED on that basis. *See Foster v. Mich.*, 573 F. App'x 377, 389-90 (6th Cir. 2014) ("Where the entity is named as a defendant, an official-capacity claim is redundant.").

### b. Individual Capacity Claims

The Court turns next to the § 1983 claims brought against Williams, Darkow and Evers in their individual capacities for the alleged violations of Crawford's Fourth Amendment rights. Defendants each argue that they are entitled to qualified immunity and that summary judgment is warranted on this basis. Defendants also argue that there is no genuine issue of material fact concerning whether Officer Williams' use of deadly force was constitutionally permissible.

In their motion for partial summary judgment, Plaintiffs argue that Officer Williams is not entitled to qualified immunity. In addition, Plaintiffs argue that, because there is no genuine issue of material fact, they are entitled to summary judgment on the § 1983 claims asserted against Williams.[3]

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates

---

[3] Plaintiffs do not seek summary judgment on any of the claims against Sergeant Darkow. As to Chief Evers, Plaintiffs seek summary judgment only on the merits of the § 1983 claims brought against him in his official capacity.

"clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). After a defendant raises a claim of qualified immunity, the plaintiff bears the burden of rebutting it. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

The doctrine of qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and, "[w]hen properly applied, protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The fact that a particular belief turns out to be mistaken does not necessarily "undermine its reasonableness as considered at the time of the acts." *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008).

To determine whether a governmental employee is entitled to qualified immunity, the court must consider: (1) whether, taken "in the light most favorable to the party asserting the injury," a constitutional right would have been violated on the facts alleged; and (2) whether the right at issue was "clearly established." *Saucier*, 533 U.S. at 201. These questions need not be considered in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the answer to either inquiry is "no," the government official is entitled to qualified immunity.

13

Nevertheless, the Court cannot grant summary judgment on the basis of qualified immunity if there is a genuine issue of material fact "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988); *Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring) ("Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be."). With these general principles in mind, the Court must consider whether Darkow, Evers and/or Williams is entitled to qualified immunity on the § 1983 claims brought against them.

### (i) Sergeant Darkow

Plaintiffs allege that, in responding to the 911 call, Sergeant Darkow and Officer Williams both violated Crawford's Fourth Amendment right to be free from the use of excessive force. Darkow maintains that he is entitled to qualified immunity because he used no force whatsoever against Crawford during the incident in question. Although he verbally commanded Crawford to drop the gun, it was Williams who fired the shots that resulted in Crawford's death. [4]

---

[4] Plaintiffs note that, in his deposition, Darkow testified that, based on the totality of the circumstances, he did not believe that he would have needed to give *any* verbal commands before using deadly force against Crawford. Doc. #134, PageID##2974-75. Chief Evers disagreed, testifying that an officer cannot rely solely on the 911 call but must assess the situation prior to using deadly force. Doc. #136, at 74. Williams likewise testified that he did not believe that he would

Plaintiffs, however, argue that because Darkow worked in tandem with Williams in confronting Crawford, and it was Darkow's verbal command that caused Crawford to turn his head toward the officers, Darkow should also be held accountable for Crawford's death. The Sixth Circuit has rejected this line of reasoning. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (rejecting argument that officer who allegedly created the circumstances leading to the use of deadly force can be held liable for a Fourth Amendment violation).

Moreover, the mere fact that Darkow was *present* when Williams used deadly force cannot subject Darkow to personal liability unless he: (1) actively participated in the use of excessive force; (2) supervised Williams; or (3) owed Crawford a duty of protection against the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). As noted above, Darkow did not actively participate in the use of deadly force, and Plaintiffs have not asserted a claim of supervisory liability against him.

Therefore, Darkow cannot be held personally liable, unless he owed Crawford a duty of protection. No such duty exists, unless Plaintiffs can show that Darkow: (1) had reason to know that Williams would use excessive force; and (2) had "both the opportunity and the means to prevent the harm from occurring."

---

have been justified in shooting Crawford based solely on what the 911 caller said. Doc. #121, PageID#2440. Regardless of what Darkow may have believed, and regardless of whether his belief was erroneous, it is only his actual *conduct* that matters.

*Id.* Plaintiffs have presented no evidence to support this theory of liability. Given that Williams fired his first shot just 1.5 seconds after Darkow gave the first verbal command and did not warn anyone that he was going to shoot Crawford, no reasonable jury could find that Darkow had either the means or the opportunity to stop him from doing so.

Based on the facts alleged, Darkow's conduct did not violate Crawford's Fourth Amendment rights. Accordingly, he is entitled to qualified immunity. Even if he were not entitled to qualified immunity, Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact with respect to the claims asserted against him. The Court therefore SUSTAINS Defendants' motion for summary judgment on the § 1983 claims brought against Sergeant Darkow in his individual capacity.

### (ii) Chief Evers

It is beyond dispute that government officials cannot be held liable "for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Here, Plaintiffs maintain that Chief Evers should be held personally liable for failing to discipline or provide corrective training to Officer Williams for previous "unreasonable and violent outbursts." Doc. #164, PageID#10831. Defendants argue that Chief Evers, who was not present at Wal-Mart during the incident in question, is entitled to qualified immunity on the alleged Fourth Amendment violation. The Court agrees.

16

Under Sixth Circuit law, a supervisor cannot be held personally liable for failure to supervise, control or train unless he or she either "encouraged the *specific incident* of misconduct or in some other way directly participated in it." *Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015) (emphasis added) (internal quotation omitted). At a minimum, the supervisor must have "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* (internal quotation omitted). *See also Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (noting that "proof of personal involvement is required for a supervisor to incur personal liability."). As the Sixth Circuit has noted, an attempt to hold a supervisor individually liable for a failure to train or supervise "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (internal quotation omitted).

Plaintiffs have presented no evidence to support a finding that Chief Evers encouraged Williams' use of deadly force against Crawford or was personally involved in the incident in any way. Nor have they presented any evidence that Chief Evers implicitly authorized, approved, or knowingly acquiesced in Williams' use of deadly force against Crawford. Accordingly, Chief Evers is entitled to qualified immunity. The Court therefore SUSTAINS Defendants' motion for summary judgment on the § 1983 claims brought against Chief Evers in his individual capacity.

### (iii) Officer Williams

Plaintiffs and the Beavercreek Defendants each argue that they are entitled to summary judgment on the § 1983 Fourth Amendment claim brought against Officer Sean Williams in his individual capacity. The Beavercreek Defendants argue that Williams is entitled to qualified immunity because, based on the totality of the circumstances, his use of deadly force was constitutionally permissible, and the law was not clearly established. They also argue that, based on the evidence presented, no reasonable jury could find that Williams' use of deadly force was constitutionally impermissible. Plaintiffs, on the other hand, argue that they are entitled to summary judgment on this claim because the relevant law is clear and, based on the evidence presented, no reasonable jury could find that Williams' use of deadly force was justified.

For the reasons set forth below, the Court concludes that genuine issues of material fact preclude summary judgment in favor of *either* party on the § 1983 claim brought against Williams in his individual capacity. Likewise, genuine issues of material fact preclude any finding of qualified immunity at this stage of the proceedings.

#### *Fourth Amendment Violation?*

The first prong of the qualified immunity analysis asks whether, taken "in the light most favorable to the party asserting the injury," a constitutional right would have been violated on the facts alleged. *Saucier*, 533 U.S. at 201.

18

An officer's use of deadly force constitutes a "seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). As the Supreme Court has noted, "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Id.* at 9. It also "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment. Against these interests are ranged governmental interests in effective law enforcement." *Id.* "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11. However,

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12. As with any claim of use of excessive force, the court must consider "the totality of the circumstances" in assessing the reasonableness of the use of deadly force. *Id.* at 8-9.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court set forth several factors to be considered in determining whether a particular use of force is objectively reasonable. The court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

19

whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*
at 396. "The 'reasonableness' of a particular use of force must be judged from the
perspective of a reasonable officer on the scene, rather than with the 20/20 vision
of hindsight." *Id.* It must allow "for the fact that police officers are often forced
to make split-second judgments—in circumstances that are tense, uncertain, and
rapidly evolving—about the amount of force that is necessary in a particular
situation." *Id.* at 396-97. With these general principles in mind, the Court turns to
the question of whether Williams' use of deadly force was constitutionally
permissible.

The first factor to be considered is the severity of the crime at issue. It is
undisputed that Ohio is an open-carry state, meaning that an individual who legally
possesses a firearm may openly carry it in public even if the gun is loaded.
Accordingly, had Crawford simply been carrying the pellet rifle inside the Wal-Mart
store, he would not have been breaking any law, even if the pellet rifle were
loaded. Doc. #134, PageID#2945. However, Ronald Ritchie, the 911 caller, told
the dispatcher that Crawford was waving the rifle around, pointing it at people and
other objects. Doc. #122-1, PageID##2837-39, 2841-44. Such actions, if true,
could have constituted a crime. Doc. #134, PageID##2951-52.

Nevertheless, as previously noted, when the officers arrived at the store,
they did not observe Crawford waving the rifle around or pointing it at people or
other objects. They heard no gunshots. Nor did they observe or hear anything
that would lead them to believe that Crawford had threatened anyone, caused any

20

injury or induced panic. Doc. #121, PageID##2469-70. On the whole, then, in looking at the severity of the crime at issue, this factor cuts slightly in favor of Plaintiffs. In addition, there is no evidence that Crawford was resisting arrest or attempting to evade arrest by flight. Therefore, this factor also cuts in favor of Plaintiffs.

In this case, the reasonableness of Williams' use of deadly force hinges almost entirely on the question of whether, at the moment he pulled the trigger, Williams reasonably perceived Crawford to pose an imminent threat of serious physical harm to the officers or others. On this subject, the parties vehemently disagree.

Plaintiffs argue that, because the situation encountered by the officers when they arrived at Wal-Mart was inconsistent with what had been reported in the 911 call, Williams erred in treating this as an "active shooter" scenario and in failing to take the time to fully assess the true situation. Although the officers were told by the dispatcher that the suspect was allegedly pointing a loaded gun at people, nothing appeared to be amiss when they arrived. The officers made their way to the pet department, where Ritchie said the man would be found.

Wal-Mart's video surveillance cameras captured a good portion of what transpired next, although the quality of the video is not very good. Officer Darkow was the first to spot Crawford. Crawford was standing alone in the aisle, facing the shelves with his left side toward Darkow. He was talking on a cell phone, which he was holding in his left hand. In his right hand, Crawford was holding

what appeared to be an assault rifle, which was pointed at the floor. Darkow took cover behind a pallet of kitty litter, pointed his gun at Crawford and yelled, "Drop the gun! Get on the ground!" In response, Crawford turned his head to look at Darkow. Doc. #134, PageID#2953.

At the same instant, Williams, who was looking down the aisle in the opposite direction, covering Darkow, spun around and raised his gun. Doc. #121-1, PageID#2506. According to Grant Fredericks of Forensic Video Solutions, Inc., who was hired by Plaintiffs to analyze the surveillance videos, Officer Williams fired his first shot at Crawford just 1.5 seconds after Darkow gave his first verbal command, and just .8 seconds after Crawford turned his head. Williams fired his second shot .32 seconds after the first. Doc. #165, PageID#10852.

The mere fact that Crawford was holding what appeared to be a loaded rifle does not render the use of deadly force *per se* reasonable. "Sometimes, the time or space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover." *Thomas v. City of Columbus*, 854 F.3d 361, 366-67 (6th Cir. 2017). However, the Fourth Amendment does not always require officers "to delay their fire until a suspect turns his weapon on them." If the armed individual makes "a furtive movement, harrowing gesture, or serious verbal threat," this may give rise to a reasonable belief that he poses an imminent threat of serious bodily harm. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

22

Williams maintains that he fired the shots because Crawford was turning toward them with the rifle in a low-ready position, placing the officers in imminent danger.[5] Plaintiffs argue, however, that Williams' belief is not substantially supported by the physical evidence. Moreover, according to Plaintiffs, the question of whether Crawford turned toward the officers is *crucial* because Defendants' own police practices expert, James Scanlon, testified that if Crawford did *not* rotate his body and gun toward the officers, there would have been no imminent threat of serious bodily harm and the shooting would not be justified. Doc. #159, PageID#10217.

Williams has made several statements concerning what he observed in that split second before he pulled the trigger. On the night of the shooting, when interviewed by Captain Grile, Williams said that Crawford took an "aggressive stance" and started to move to the left "like he was going to do something with the rifle." Doc. #121, PageID#2461. Williams told Grile that he fired the shots because he believed that his own life, the life of Sergeant Darkow, and the lives of

---

[5] A "low-ready" position is one in which the weapon is partially raised. Williams testified that a rifle can be held in a low-ready position with just one hand. Doc. #121, PageID##2440-41. However, as explained by Melvin Tucker, Plaintiffs' expert witness, typically, both hands are on the weapon and "your finger is on the trigger" so that all you have to do is raise the weapon, point and shoot. Doc. #162, PageID#10360. This can typically be done in .83 seconds. *Id.* Accordingly, if Crawford were holding the rifle in a low-ready position, this would add some credence to Williams' claim that he believed that he was in imminent danger. Nevertheless, Williams admitted that, because Crawford was holding the rifle in his right hand, he has no idea whether Crawford's finger was anywhere near the trigger. Doc. #121, PageID#2441.

the people inside Wal-Mart were in immediate danger. Doc. #121-1,
PageID##2506-07.

Three days later, on August 8, 2014, Williams participated in an interview
with Agent Hornyak of the Ohio Bureau of Criminal Investigation. He told Hornyak
that, instead of dropping the rifle as Darkow had commanded, Crawford swung
toward them and took an aggressive stance. Doc. #121-2, PageID#2615.
Crawford allegedly made an aggressive movement and had the "rifle in a position
to where he could have raised it up or he could have shot either me or Sergeant
Darkow." Doc. #121-1, PageID#2532. He made "an agitated movement with it
as if he wasn't going to listen." *Id.* at PageID#2562. While reviewing the
surveillance tape with Agent Hornyak, Williams indicated that he saw Crawford
bring the rifle up and take an aggressive stance and felt that the video confirmed
what he had seen. Doc. #121-2, PageID##2615, 2618.

Williams subsequently gave a written statement. Doc. #121-1,
PageID##2498-99.[6] He said that Crawford failed to comply with repeated
commands to drop the weapon and then "turned towards us in an aggressive
manner with the rifle in hand." *Id.* at PageID#2499. At his deposition, taken on
September 15, 2017, Williams testified that when he fired the shots at Crawford,
Crawford was in a crouched position, with the weapon at a low 45-degree angle,

---

[6] Although the statement is dated August 5, 2014, Williams testified that he did
not type it until after his interview with Agent Hornyak. Doc. #121,
PageID#2456.

24

turning to face him. He did not know if Crawford's finger was anywhere near the trigger, but he believed that Crawford was about to point the weapon at him or Sergeant Darkow. Doc. #121, PageID##2435-36, 2440-41, 2444-45.

Sergeant Darkow's characterization of Crawford's movements in response to the verbal command has evolved over time. On the night of the shooting, Darkow told Captain Grile that Crawford slightly flexed his knees and started to *move away* as if he were going to duck behind the endcap of the shelving unit. Darkow did not tell Captain Grile that Crawford turned toward the officers in an aggressive manner. Doc. #134, PageID##2955-57.

On August 8th, Darkow told Agent Hornyak that he did not notice that Crawford was holding a cell phone in his left hand. He believed that Crawford had both hands on the rifle. When he gave the verbal commands to Crawford, Crawford appeared startled and shocked. *Id.* at PageID##2950, 2953, 2961. Darkow told Agent Hornyak that after the commands were given, Crawford *turned to his right* and acted as if he were going to take a position of cover. Again, Darkow did not tell Hornyak that Crawford turned toward him with the gun. *Id.* at PageID##2958-59. In an August 18, 2014, written statement, Darkow stated that, instead of complying with the verbal commands, Crawford looked at the officers and "made a quick movement." Doc. #134-3, PageID#3026. Darkow did not specify in which direction Crawford moved or the nature of the movement.

In subsequent Answers to Interrogatories, however, Darkow stated that "[a]fter Mr. Crawford was told to drop the weapon and get on the ground, he

quickly *turned toward us* with the assault rifle in his hand. As Plaintiff turned toward us, it appeared as if he bent his knees slightly, to be in a tactical stance." Doc. #134-3, PageID#3036 (emphasis added). Again, at his deposition, taken on September 14, 2017, Darkow testified that after he gave the commands, Crawford "crouched from a low ready position." He "turned slightly *towards us*, the shots were fired, and *then* he moved or darted towards the endcap." Darkow admitted that this was different than what he told Grile and Hornyak three years earlier. Doc. #134, PageID##2964-65 (emphasis added).

Darkow also testified that, even though he may have been justified in shooting Crawford, he did not consider pulling the trigger. His instinct was to take cover and give a verbal command. *Id.* at PageID#2977. This is significant because, as the Sixth Circuit noted in *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989), "the jury might reasonably consider why the other [] officer[] did not fire shots if it was quite obvious that they were being threatened with imminent bodily harm."

Of course, Crawford is no longer alive to give his account of what he did in response to Darkow's command to drop the gun. In resolving the inconsistencies between the officers' statements, the Court may consider competent expert and physical evidence. *George*, 736 F.3d at 834. Unfortunately, that evidence does not conclusively prove whether Crawford turned his body or his gun toward the officers, such that Williams would have reasonably perceived an imminent threat of serious physical harm.

Defendants' police practices expert, James Scanlon, maintains that the surveillance video shows Crawford rotating his body toward the officers and rotating the gun toward the officers in what appears to be a low-ready position. Scanlon then opines that these movements justified the use of deadly force. Doc. #159, PageID#10214-16. In the Court's view, however, the surveillance video is inconclusive. It does show Crawford flexing his knees as he turns to look at Darkow and slightly lifting the tip of the gun, which had been pointed at the floor, up to the point where the floor meets the shelving unit. However, it does not clearly show Crawford rotating either his body or his gun toward the officers.

Eugene Liscio, an engineer hired by Plaintiffs to conduct a 3-dimensional reconstruction of the shooting, concluded that "John Crawford did not rotate his body or the gun toward the officers during the interaction before John was shot." Doc. #166, PageID#10897. Likewise, Grant Fredericks, who analyzed the video surveillance tape at Plaintiffs' request, determined that "Mr. Crawford did not raise the gun in the direction of the officers at any time prior to the first shot being fired." Doc. #165, PageID#10852. Defendants' own pathologist, George Nichols, II, M.D., admitted that Crawford was standing at roughly a 90-degree angle to Williams' gun and "had not turned towards the officers before being shot." Doc. #157, PageID##10105-06.

According to the coroner's report, one bullet passed through Crawford's left elbow. The other bullet, the one that caused Crawford's death, passed through his ribs, his transverse colon, his liver, his kidney and his diaphragm. One of the two

bullets also passed through Crawford's right forearm. Both bullets traveled from the left side of his body to the right side. Doc. #173, PageID#12019, 12029-31, 12045-48. The coroner, Robert S. Shott, M.D., testified, however, that, given the path of the bullet that lacerated the liver, Crawford would have been turned slightly toward the officers, perhaps at a seventy-degree angle, but "definitely more left to right than front to back." *Id.* at PageID#12055.

From this physical evidence, a reasonable jury could infer that Crawford had, in fact, begun to rotate his body toward the officers before Williams fired the first shot. As Plaintiffs point out, however, the trajectory of the bullet is determined only by the angle of the gun in relation to Crawford's body at that particular moment. The trajectory of the bullet does not necessarily prove that Crawford was turning his body toward the officers at the moment the bullet was fired. It could simply mean that Crawford was not standing at an exact 90-degree angle to Officer Williams' gun at the time the shots were fired.

Even assuming that Crawford slightly lifted the tip of the rifle and slightly rotated his body toward the officers, a reasonable jury could nevertheless find that it was not objectively reasonable for Williams to interpret these movements as posing an immediate threat of serious bodily harm. As previously noted, when Darkow commanded Crawford to drop the gun, Crawford appeared to be shocked and startled. Plaintiffs maintain that Williams should have *expected* Crawford to turn his head in response to Darkow's command. In fact, this is "the most natural reaction when someone yells in your direction." *Estate of Lopez v. Gelhaus*, 871

F.3d 998, 1021 (9th Cir. 2017). It could be that, as he turned his head toward the officers, Crawford's body naturally rotated with it, making the pellet rifle raise up slightly. A reasonable jury could find that, in that situation, Williams could not have reasonably construed Crawford's movements as a threatening or "harrowing gesture," posing an immediate threat. *Id.* at 1020-21.

Other factors must also be considered in determining whether Williams reasonably perceived Crawford to pose an imminent threat. For example, it is undisputed that, at the moment of the shooting, Crawford was talking on a cell phone, which he was holding in his left hand, the hand closest to the officers. Given that only his right hand was on the pellet rifle, this could affect how quickly Crawford would have been able to raise the rifle, point and shoot. A reasonable jury could find that it was not objectively reasonable for Williams to fail to notice that Williams was holding a cell phone in his left hand.

Plaintiffs further argue that Williams did not give Crawford adequate time to process Darkow's command or to comply with it. Their expert witness, Melvin Tucker, stated that it takes the average person 1.5 seconds after hearing a command to evaluate what he heard, to decide to act, and then to act. Doc. #162-1, PageID#10489. Williams and Darkow both testified that they did not know whether Crawford understood Darkow's command to drop the gun or had time to process it. Doc. #121, PageID##2443, 2473; Doc. #134, PageID#2955. Moreover, Crawford may have needed some additional time to process Darkow's

command given that Crawford was talking on his cell phone and neither Darkow nor Williams identified themselves as police officers.

A recent case from the Ninth Circuit is instructive. In *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), officers on routine patrol one afternoon noticed thirteen-year-old Andy Lopez walking away from them down a sidewalk. Lopez, who was walking at a normal speed, was carrying what appeared to be an AK-47 in one hand, with the muzzle pointed at the ground. The officers stopped approximately 40 feet behind him. Officer Gelhaus exited the car, drew his gun and yelled "Drop the gun!" Lopez paused a few seconds and began to rotate his body toward the officer. The parties disputed whether Lopez raised the muzzle of the rifle as he turned. Gelhaus fired eight shots, hitting Lopez in the chest and killing him. It was then discovered that the "AK-47" was actually a plastic toy gun. Lopez's family sued Gelhaus, alleging use of excessive force. The district court denied summary judgment on qualified immunity.

The Ninth Circuit affirmed, finding several genuine issues of material fact. It was not clear whether Lopez was aware of the officers' presence before he heard Gelhaus yell, "Drop the gun!" The court noted that:

> This disputed fact is significant because it sheds light on Andy's possible motivations in turning to face the officers. In particular, Andy's subsequent turn appears less aggressive because he could have been attempting to see if he was the object of the call, or could have been turning out of startled confusion given that he was carrying only a toy gun.

*Id.* at 1007.

30

The parties in *Lopez* also disputed how many verbal commands were given. The court noted that "[a]ssuming there was only one shout, Andy may have been wondering if it was directed at him, or he could have been processing Gelhaus's order in the three seconds before he was shot." *Id.*

The most important factual dispute concerned the movement of Andy's gun. The district court found that, because Andy was holding the gun in just one hand, with the barrel was pointing at the ground, it could have been raised slightly without posing any immediate threat to the officers. "Moreover, one would expect the barrel to rise an inch or so as the momentum of Andy's clockwise turn moved his left arm slightly away from his body. But that incidental movement alone would not compel a jury to conclude that Gelhaus faced imminent danger given the starting position of the gun." *Id.* at 1007-08.

The court concluded that, viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that Gelhaus had violated Andy's Fourth Amendment rights by using deadly force "without knowing if Andy's finger was on the trigger, without having identified himself as a police officer, and without ever having warned Andy that deadly force would be used." *Id.* at 1011.

Crawford's case is admittedly factually distinguishable in that the Beavercreek officers, rather than being on routine patrol, were responding to a 911 call in which the caller stated that Crawford was pointing a loaded gun at people. Nevertheless, as in *Lopez*, when the officers first saw Crawford, he was holding the gun in one hand, with the muzzle pointed at the floor. They did not identify

themselves as police officers and gave him no time to comply with their verbal command. They issued no warning prior to shooting him. A reasonable jury, viewing the evidence in the light most favorable to Plaintiffs, could find that the incidental movement of Crawford's body or the pellet rifle as he turned his head to see who was yelling at him could not reasonably be perceived as a furtive movement or harrowing gesture that justified the use of deadly force.

For all of these reasons, the Court concludes that the facts alleged, viewed in the light most favorable to Plaintiffs, could support a finding that Williams violated Crawford's Fourth Amendment rights. Accordingly, Officer Williams is not entitled to qualified immunity on the first prong of the qualified immunity analysis, *i.e,* whether a constitutional violation occurred.

Qualified immunity aside, for the same reasons, the Court also finds that genuine issues of material fact preclude summary judgment in favor of *either* party on the question of whether Officer Williams reasonably believed that Crawford posed an immediate threat of serious physical harm to the officers or to others such that the use of deadly force was warranted. Viewing the facts in the light most favorable to Williams, a reasonable jury could find that his use of deadly force was justified. Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that it was not.

*Clearly Established Law?*

Even though the facts alleged, viewed in the light most favorable to Plaintiffs, could support a finding that Williams violated Crawford's Fourth Amendment rights, Williams may still be entitled to qualified immunity on the § 1983 claim if the constitutional right at issue was not "clearly established in a 'particularized sense,' such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004)).[7] Williams argues that the constitutional right at issue in this case was not clearly established. Plaintiffs disagree.

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). In determining whether the right is clearly established, the court looks first to decisions of the Supreme Court, then to circuit court and district court decisions within the circuit where the trial court sits,

---

[7]   It is not enough that a constitutional right is clearly established in a general abstract sense. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Accordingly, a finding that Crawford had a clearly established right not to have deadly force used against him unless he posed an imminent threat of serious bodily harm is insufficient.

and then to decisions of other federal appellate courts. *Andrews v. Hickman Cty.,* 700 F.3d 845, 853 (6th Cir. 2012).

Although the conduct at issue in those cases need not be identical to that in the case under consideration, the legal precedent must compel the conclusion that the conduct is unlawful. *Hensley v. Gassman,* 693 F.3d 681, 687 (6th Cir. 2012). *See also Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003).

In the deadly-force context, the Supreme Court has held that it is not enough that the law is clearly established that deadly force may be used only when the officer reasonably believes that the suspect poses a threat of serious physical harm to the officer or others. Rather, the appropriate question is whether it is clearly established that use of deadly force is unconstitutional *in the particular or specific situation confronted by the officer. Mullenix v. Luna,* —U.S.—, 136 S. Ct. 305, 308-09 (2015) (emphasis added).[8]

---

[8] Williams cites to several Sixth Circuit cases in which officers who used deadly force against a suspect with a weapon were granted qualified immunity. *See, e.g., Bell v. City of E. Cleveland,* 125 F.3d 855 (Table) (6th Cir. Oct. 14, 1997) (granting qualified immunity to officer who shot and killed teenager who turned toward him and raised a toy gun at him); *Boyd v. Baeppler,* 215 F.3d 594, 603-64 (6th Cir. 2000) (granting qualified immunity to officers who used deadly force

34

In addressing the second prong of the qualified immunity analysis, however, the Court must draw all inferences in favor of the non-moving party and cannot resolve any genuine issues of material fact. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court must deny qualified immunity where factual disputes are critical in determining whether an officer's use of deadly force violated a clearly established constitutional right. *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (noting that, where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," then "the jury becomes the final arbiter" of the qualified immunity claim).

The Court concludes that, until a jury resolves the critical factual dispute of whether Crawford rotated his body or the rifle toward the officers or made some other "furtive movement" or "harrowing gesture," giving rise to a reasonable belief that he posed an imminent threat of serious bodily harm, *George*, 736 F.3d at 838, it cannot be determined whether Williams' use of deadly force violated a clearly established right.

If, as Officer Williams claims, Crawford took an aggressive stance and rotated his body or the rifle toward the officers, then Crawford had no clearly

---

against suspect who pointed a gun at them and disobeyed orders to stop); *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 405-06 (6th Cir. 2007) (granting qualified immunity to officer who used deadly force against violent, armed suspect who was resisting arrest). The Court finds each of these cases to be factually distinguishable from the case at hand, in that the suspects either pointed the weapons directly at the officers or were resisting arrest.

established right to be free from the use of deadly force. In fact, quite the opposite is true. *See Bell v. City of E. Cleveland*, 125 F.3d 855 (Table) (6th Cir. 1997) (holding that officer was entitled to qualified immunity on deadly force claim where teenager had turned toward him and pointed a toy gun at him); *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000) (granting qualified immunity to officer where suspect pointed his gun at officers and ignored their commands to stop); *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("threatening an officer with a weapon does justify the use of deadly force."); *Chappell*, 585 F.3d 901 (granting qualified immunity to officer who shot teenager who continued advancing toward officers with a knife in hand).

The Sixth Circuit has recently rejected a "categorical rule" that the use of deadly force is reasonable *only* if the suspect raises his weapon. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017). But, on the other hand, deadly force is not justified merely because the suspect is holding a gun. This is just one factor to be considered in assessing the totality of the circumstances. *Id.* at 366-67. For example, in *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 405 (6th Cir. 2007), the court found that even if the suspect was not aiming his gun at the police, the officer still had probable cause to believe that the suspect posed an imminent threat given his proximity "while armed with a rifle, his prior violent behavior, and his continued refusal to surrender and face arrest."

Williams argues that, even if the Court views the facts in the light most favorable to Plaintiffs and resolves all factual disputes in their favor, existing

precedent did not put him on notice that the use of deadly force in the situation he encountered was unconstitutional. The Court disagrees.

Although Plaintiffs have not cited any case directly on point, the law is clearly established that, even when officers respond to a report that a suspect is brandishing a loaded gun, the use of deadly force is not justified unless the suspect either points the gun at the officers or makes some other kind of movement, gesture or verbal statement giving rise to a reasonable belief that the officers or others were in imminent danger of serious bodily harm.

For example, in *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012), officers responded to a call alleging that Roger King had pointed a gun at his ex-wife and said that he was going to kill someone that day. The responding officers were also aware that, years earlier, King had fired shots at a state trooper who had entered his property. When the officers arrived at King's house, King was lying on his couch in his underwear. According to the officers, King sat up and pointed a gun directly at them. In response, Officer Taylor shot and killed him.

Viewing the facts in the light most favorable to King, however, the court concluded that, based on expert witness testimony, there was a genuine issue of material fact as to whether King had pointed his gun at the officers before he was shot and whether Taylor therefore reasonably believed that he or others were in imminent danger. *Id.* at 663. As to the second prong of the qualified immunity analysis, the court stated "we have little trouble concluding that if Taylor shot King

while he was lying on his couch and not pointing a gun at the officers, Taylor violated King's clearly-established right to be free from deadly force." *Id.* at 664.

Likewise, in *George v. Morris*, 736 F.3d 829 (9th Cir. 2013), a woman called 911 to report that her elderly husband had a loaded gun. Responding officers were told to expect a domestic disturbance. When they arrived at the house, the woman told them that her husband was on the patio, holding his gun. By that time, she was in no immediate danger. The officers identified themselves and asked the suspect to show them his hands. He exited onto the balcony with his walker, holding a gun with the barrel pointed down.

Within seconds, the officers fired multiple shots and killed him. There was a genuine factual dispute as to whether he manipulated the gun or pointed it at the deputies before they killed him. The district court denied qualified immunity on that basis. The Ninth Circuit noted that, in some instances, officers need not always "delay their fire until a suspect turns his weapon on them. If a person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." The court acknowledged the "potentially volatile and dangerous situation these deputies confronted," but noted that it was unable to determine if the officers' conduct "stayed within constitutional bounds" without knowing exactly what transpired immediately before the shots were fired. *Id.* at 838.

The same is true here. Although the officers responded to a 911 call that Crawford was allegedly pointing a loaded gun at people inside a crowded Wal-Mart

store, nothing appeared to be amiss when the officers arrived. They found Crawford standing by himself, looking at the shelves. The rifle, which he held in his right hand, was pointed at or near the floor. In his left hand, Crawford was holding a cell phone to his ear, although this fact apparently went unnoticed by the officers. When Sergeant Darkow gave the verbal command to drop the gun, Crawford turned his head to look at him. Less than two seconds later, Williams fired two shots at Crawford. Until a jury determines whether Crawford rotated his body or the rifle toward the officers or made some kind of movement or gesture that created a reasonable belief that he posed an immediate risk of serious harm to the officers or others, it cannot be determined whether existing precedent made it clear to a reasonable officer that the use of deadly force was constitutionally impermissible in the situation with which Williams was faced.

Williams notes that, in *King*, the court did not hold that the officers' conduct violated King's Fourth Amendment rights; rather, it simply held that genuine issues of material fact precluded summary judgment on the question of qualified immunity. The same would be true with respect to *George*. Williams maintains that unless Plaintiffs can identify a case holding that the use of deadly force in a substantially similar situation actually violated the Constitution, it cannot be said that the law was clearly established.

The Court rejects this argument. Implicit in each of these holdings is that, if the disputed facts are resolved in the plaintiffs' favor at trial, then the officers would be deemed to have violated clearly-established constitutional rights and

would not be entitled to qualified immunity. *See, e.g., Brandenburg*, 882 F.2d at 216 (noting, in discussing the question of qualified immunity, "[i]f the jury determines that Sharp fired on Brandenburg without a belief that someone was in danger of serious bodily injury, then as a legal matter no reasonable officer could believe that such gunfire would not violate another's constitutional rights.")

In this case, there are critical factual disputes concerning exactly what movements or gestures Crawford made after Sergeant Darkow commanded him to drop the rifle. Until those disputes are resolved, it cannot be determined whether Williams' use of deadly force violated a clearly established constitutional right. Accordingly, at this juncture, the Court cannot yet determine whether Williams is entitled to qualified immunity on the § 1983 claims asserted against him in his individual capacity.

### 2. Municipal Liability Claims

The Court turns next to the § 1983 claims brought against the City of Beavercreek. The parties have filed cross-motions for summary judgment on the claims against the City.

A governmental entity cannot be held liable under § 1983 merely because it employs an individual who engages in unconstitutional conduct. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To succeed on a claim against a municipality, a plaintiff must prove that "(1) agents of the municipality, while acting under color of state law, (2) violated the plaintiff's constitutional rights, and (3) that a municipal policy or policy of inaction was the moving force behind the

40

violation." *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).

Such a policy or custom may consist of: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Plaintiffs' claims against the City of Beavercreek are based on the third and fourth theories of liability.

### a.  Plaintiffs' Motion

The Court turns first to Plaintiffs' motion for summary judgment on their § 1983 claims against the City. They note that, in his deposition, Chief Evers testified that, in using deadly force against Crawford, Williams acted in compliance with all departmental policies and procedures. Doc. #136, at pp. 170-71. Plaintiffs reason that, because the City found that Williams acted in accordance with departmental policies and procedures, and because no reasonable jury could find that Williams' actions were constitutionally permissible, the City is automatically liable.

Setting aside the fact that the Court has already found that genuine issues of material fact exist concerning whether Williams' use of deadly force was constitutionally permissible, Plaintiffs' reasoning is still flawed. The case that Plaintiffs cite in support of their motion, *Strachan v. City of Federal Heights*, 837

41

F. Supp. 1086 (D. Col. 1993), involved a similar situation in that the City had determined that the officer's use of deadly force conformed to departmental policies. The court found that genuine issues of material fact precluded summary judgment on the question of whether the officer violated the plaintiff's constitutional rights. It then denied the City's motion for summary judgment, because "it would be anomalous to hold Officer Vallero responsible for violating Mr. Strachan's rights, but to release the city after it has admitted that the shooting conformed to its policy." *Id.* at 1092. Of note, it did not hold that, if the officer were found liable, the city would automatically also be liable.

The other case relied on by Plaintiffs, *Kersh v. Derozier*, 851 F.2d 1509 (5th Cir. 1988), is factually distinguishable. Therein, the court held that, where the parties had stipulated that an officer's actions, in refusing to allow a handcuffed arrestee to wash a piece of hay out of his eye, complied with departmental policies, the city's liability would be automatically triggered if the jury found that the officer had violated the plaintiff's constitutional rights by exhibiting deliberate indifference to his serious medical needs. Not surprisingly, the court found that, in such a situation, the policy would necessarily be the moving force behind the constitutional violation. *Id.* at 1513. As the Sixth Circuit has noted, "when an injury is caused by the straightforward carrying out of a municipal policy or custom, the determination of causation is easy." *Morgan v. Fairfield Cty.*, 903 F.3d 553, 566 (6th Cir. 2018).

In this case, however, Crawford's death was not caused by the straightforward application of a municipal policy or custom. Accordingly, even if a jury were to find that Williams' use of deadly force was constitutionally impermissible, the City cannot be held liable unless Plaintiffs also establish a causal link. A custom or policy of the City must be the moving force behind the constitutional violation. The internal review board's *after-the-fact* finding that Williams' use of deadly force did not violate departmental policy cannot provide that causal link. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (holding that sheriff's after-the-fact approval, which did not itself cause the alleged harm, was insufficient to establish *Monell* liability).

For the foregoing reasons, the Court OVERRULES Plaintiffs' motion for summary judgment on the § 1983 claims against the City of Beavercreek.

### b.     Defendants' Motion

The Court next turns its attention to the City's motion for summary judgment on the § 1983 claims asserted against it. The City argues that it is entitled to summary judgment because: (1) Plaintiffs have failed to present sufficient evidence from which a reasonable jury could find an underlying constitutional violation; and (2) Plaintiffs have failed to present sufficient evidence from which a reasonable jury could find that a policy or custom of the City was the moving force behind the alleged constitutional violation.

The Court has already held that a reasonable jury could find that Officer Williams violated Crawford's constitutional rights by using deadly force against

him.[9]  The Court therefore turns to the question of whether, based on the evidence

presented, a reasonable jury could find that a policy or custom of the City was the

moving force behind the alleged constitutional violation.

As Defendants note, Plaintiffs have not identified any policy of the

Beavercreek Police Department that is unconstitutional on its face.  The

Department's Response to Resistance Policy, governing the use of deadly force,

states as follows:

> A.  Deadly force may be used by officers only when they reasonably
> believe that the action is in the defense of human life, including the
> officer's own life, or in the defense of any person in imminent danger
> of serious physical harm.  An officer may use deadly force to affect
> the arrest or prevent the escape of a suspected felon where the
> officer has probable cause to believe that the suspect poses a
> significant threat of death or serious physical injury to the officer or
> others. Under such circumstances, a verbal warning should precede
> the use of deadly force, where feasible.

Doc. #136-16, PageID#4049.  This Policy conforms to standards set by the

Commission on Accredited Law Enforcement Agencies ("CALEA").  Doc. #136, p.

19-22.  It also comports with the principles set forth in *Tennessee v Garner*, 471

U.S. 1 (1985).  Plaintiffs do not challenge the constitutionality of this written

policy.

---

[9]  The Court rejects Plaintiffs' claim that this finding *requires* the Court to overrule
the City's motion for summary judgment.  As previously noted, even if Plaintiffs
can prove a constitutional violation, the City cannot be held liable unless Plaintiffs
also prove that a policy or custom of the City was the moving force behind that
violation.  In order to survive summary judgment on this claim, Plaintiffs must
present sufficient evidence from which a reasonable jury could find in their favor
on *both* elements.

Plaintiffs instead argue that the City is liable for: (1) failing to properly train and supervise Williams on the constitutional limits of use of force; and (2) ratifying Officer Williams' use of excessive force.  According to Plaintiffs, Officer Williams' propensity to use force, combined with his history of other problematic behavior, should have alerted the City of the need to provide additional training and supervision to protect the rights of the citizens with whom he came into contact.

### (i)    Failure to Train and Supervise

The Sixth Circuit has held that, in order for municipal liability to attach based on a claim of failure to train or failure to supervise, a plaintiff must prove the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

The City argues that it is entitled to summary judgment on this claim, because Plaintiffs have not presented sufficient evidence from which a reasonable jury could find in their favor on each of these required elements.

#### *Adequacy of Training or Supervision*

Evidence shows that all Beavercreek police officers receive extensive training.  In fact, Chief Dennis Evers testified that the officers receive, on average, more than 90 hours of training per year.  This includes firearms training and training on the Response to Resistance Policy.   Doc. #136, pp. 49-50.  Officer Williams, who has been with the Beavercreek Police Department since 2005,

45

received annual training on the use of force. Doc. #121, PageID##2446, 2477. In 2010, he also attended a Firearms Safety Tactics program, which covered numerous use-of-force scenarios. *Id.* at PageID##2452-53.[10] In addition, Williams attended Active Shooter training just two weeks before the Crawford incident. *Id.* at PageID#2469.[11]

Plaintiffs' challenge in this case is not to the adequacy of the police department's training program in general. Rather, Plaintiffs argue that, given Williams' history of escalating difficult situations and his known propensity to use force much more often than his fellow officers, his particular training and supervision was inadequate for the tasks he was required to perform. They further argue that, with respect to Williams, the need for additional training and supervision was obvious.

Chief Evers admitted in his deposition that Williams is considered to be an "aggressive officer." Doc. #136, p. 137. Melvin Tucker, Plaintiffs' police practices expert, analyzed use-of-force statistics for the Beavercreek Police Department for the time period from 2006 through 2013. Tucker notes that, during that time period, Williams used force 36 times. During the same time

---

[10]   Williams testified that, during that training, he was taught "[t]hat if someone is about to point a gun at you to shoot them to stop the threat." An officer need not wait until the gun is pointed directly at them. Doc. #121, PageID#2453.

[11]   The parties disagree about whether "active shooter" training was relevant to Crawford's situation. The Beavercreek Defendants argue that, although no shots were fired, Crawford was clearly an "active threat" and it was appropriate for the officers to treat the situation as such.

period, the next closest officer used force only 19 times. Doc. #162-1, PageID##10489, 10514. Of the 58 officers tracked during this 8-year time period, there were an average of 4 uses of force per officer. Williams, however, averaged more than 4 use-of-force incidents *each year*. *Id.* at PageID#10490. In other words, Williams was more than 8 times more likely to use force than the average Beavercreek officer. Tucker concluded that "[c]learly, Williams demonstrated a propensity to use force at a much greater rate than any of the other officers on the Beavercreek Police Department." *Id.*

On June 27, 2010, Williams was involved in the only other fatal shooting in the history of the Beavercreek Police Department. Doc. #137, pp. 16-18. While responding to a domestic violence call, Williams shot and killed Scott Brogli, who was intoxicated and was allegedly charging at the officers with a knife. It was determined that Williams acted in self-defense and that the use of deadly force was warranted.

Plaintiffs also cite to several citizen complaints about Williams' interactions with members of the public. In 2007, there were two informal complaints about Williams' verbal communications with citizens. In March of that year, Williams, while trying to gain control of a situation, allegedly pushed a woman and yelled at her family members to shut up. Although the woman initially said that she wanted to file assault charges against Williams, she failed to file a formal complaint. In discussing this incident with his supervisor, Williams admitted to yelling at the woman's family members but denied shoving her. The supervisor discussed with

47

Williams how to establish his authority without yelling "shut up." He found the woman's complaint of shoving to be unfounded and considered the matter closed. Doc. #140-14, PageID#8622.

In November of 2007, two women called to complain about inappropriate, profanity-laced comments that Williams had made to their teenage family members who had snorted at him like pigs in the mall parking lot. Williams denied using profanity. His sergeant discussed the incident with him and reminded him that he must be professional at all times. Doc. #140-14, PageID##8614-15.

In October of 2007, Williams tased a suspect in the course of arresting him on complaints of public indecency. The suspect did not file a complaint. Although Williams' supervisor found the use of force to be justified, he critiqued the incident with Williams and the other officer who was involved. They "explored *alternatives* to pursuing an immediate physical arrest," including using "'verbal judo' to de[-]escalate a situation." *Id.* at PageID#8618 (emphasis in original).

Williams' 2009 performance evaluation cites to two more informal complaints about Williams' demeanor and language on the job. Again, he was instructed to work on maintaining a professional demeanor when dealing with the public. Doc. #140-13, PageID# 8597.

A formal complaint was filed in 2011 by Lanette Walker, concerning Williams' conduct while investigating a possible misdemeanor drug crime. Williams allegedly ordered a teenager out of Walker's house, acted aggressively, used profanity and generally behaved unprofessionally. Williams maintained that Walker

48

had grabbed his arm at one point. Doc. #121-2, PageID#2639. He told his sergeant that he "would have been justified grabbing her arm . . . and throwing her across the lawn." The supervisor found that Williams had escalated the situation and had shown no remorse. *Id.* at PageID#2647.

In the Court's view, Williams' grossly disproportionate use-of-force statistics, combined with the above-cited citizen complaints, could convince a reasonable jury that the training and supervision that he was given was inadequate for the tasks he was required to perform. As one district court recently held:

> The fact that a single officer is the subject of a large number of excessive force complaints, in and of itself, creates a reasonable need to review the officer's performance to determine the legitimacy of the complaints and what may be necessary to correct any improper use of force. . . A pattern or history of excessive force claims against a single officer may demonstrate a high likelihood of similar future incidents unless that officer is supervised differently. A failure to take corrective action in the face of such a pattern of conduct suggests a deficiency in supervision.

*Zartner v. City & Cty. of Denver, Col.*, 242 F. Supp. 3d 1168, 1174-75 (D. Colo. 2017).

Here, although Officer Williams does not have a history of *excessive* force claims, it is undisputed that he uses force considerably more often than any other officer on the Beavercreek police force. His use of force was the subject of at least one citizen complaint. In addition, there are other documented incidents in which he acted aggressively, used profanity in dealing with the public and generally displayed a lack of professionalism. Based on the foregoing, a reasonable jury could find that Williams needed additional guidance concerning how to de-

escalate a stressful situation prior to resorting to the use of force. A reasonable jury could find that the fact that Williams felt the need to use force considerably more often than any other officer on the Beavercreek police force should have alerted his supervisors to the likelihood that he would continue to do so unless he was supervised differently.

### Deliberate Indifference

Plaintiffs must prove not only that Williams' training or supervision was inadequate for the tasks he was required to perform, but also that the City was deliberately indifferent to the obvious need for additional training or supervision.

The Sixth Circuit has held that there are two ways to establish deliberate indifference: (1) through evidence of "prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"; or (2) through evidence of "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) and *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

In this case, Plaintiffs have presented no evidence of a pattern of prior instances of excessive force by Officer Williams or any other Beavercreek police officers. Rather, they rely on the second method of establishing deliberate

50

indifference, a single violation accompanied by a showing that the City failed to

train him to handle recurring situations presenting an obvious potential for

constitutional violations.  As the Supreme Court held in *City of Canton v. Harris,*

489 U.S. 378 (1989):

> it may happen that in light of the duties assigned to specific officers
> or employees the need for more or different training is so obvious, and
> the inadequacy so likely to result in the violation of constitutional
> rights, that the policymakers of the city can reasonably be said to
> have been deliberately indifferent to the need. In that event, the
> failure to provide proper training may fairly be said to represent a
> policy for which the city may be held liable if it actually causes injury.

*Id.* at 390.  Plaintiffs maintain that, with respect to Officer Williams, the need for

more or different training and supervision was obvious, and the failure of the City

to provide such training and supervision was so likely to result in the violation of

the constitutional rights of the people with whom Williams came into contact, that

the City can reasonably be said to have been deliberately indifferent to that need.

At his deposition, Plaintiffs' police practices expert Melvin Tucker explained

that because Williams' statistical use of force was so far outside the normal

parameters of other officers on the Beavercreek police force, this should have

raised a red flag and prompted further inquiry into the *cause* of the statistical

disparity.  Doc. #162, PageID##10401-08.  Tucker admits that he did not look at

Williams' 36 use-of-force reports to determine whether any *particular* use of force

was inappropriate.  *Id.* at PageID#10409.  He opined, however, that even if each

use of force was found to be justified, additional training on de-escalation

techniques may have been warranted given the huge statistical disparity.  *Id.* at

PageID#10410-11.  In other words, even without a pattern of use of *excessive* force, Williams' overall pattern of conduct warranted intervention.

In his report, Tucker also notes that generally "a small percentage of police officers are responsible for a disproportionate share of citizen complaints." Accordingly, the United States Commission on Civil Rights suggested many years ago that police departments develop "Early Warning Systems," designed to identify "problem officers" and provide early intervention.  Such officers are identified by the numbers of citizen complaints, use-of-force incidents, or whatever other criteria is deemed relevant.  Doc. #162-1, PageID#10490.  Tucker opined that "[h]ad the Beavercreek Police Department put into place such a system, it is likely Williams' propensity to use force at a much higher rate than the other officers of the Beavercreek Police Department would have been identified and intervention methods could have been taken to prevent incidents, such as the shooting death of John Crawford."  *Id.*

The City points out that it has numerous internal policies and procedures in place to identify and resolve problems as they occur.  For example, Beavercreek requires each use of force to be reviewed for compliance with departmental policy. When deadly force is used, a review board conducts an investigation and makes a recommendation to the Chief of Police.  Doc. #139-19, PageID#7402.  Moreover, policies and procedures require the Chief of Police or his designee to conduct a yearly analysis of Response to Resistance reports to look for patterns that could

indicate the need for additional training or policy modifications. Doc. #139-18, PageID#7374.

In addition, all allegations of employee misconduct are investigated and promptly adjudicated. Doc. #140-4, PageID#8133. Statistical summaries of complaints that are filed are published each year. *Id.* at PageID#8138. Moreover, contrary to what is suggested in Tucker's report, the Department already has a "Personnel Early Intervention Program" which, based on performance evaluations, citizen complaints, disciplinary actions and response-to-resistance reports, is used to identify employees who may need intervention efforts. Doc. #139-22, PageID##7675-77.

The fact that these policies and procedures exist on paper does not preclude a finding of deliberate indifference. The City maintains that it complied with each of these policies in supervising and disciplining Officer Williams. For example, it notes that, even though Williams may have used force eight times more often than the average Beavercreek police officer, each use of force from 2006 through 2013 was reviewed and found to be in compliance with departmental policy. Doc. #121-3, PageID##2745-61. The City further argues that the police department takes each use of force seriously and does not rubber stamp its officers' conduct. In support, however, they cite to just one instance, in 2009, where another officer's use of force was deemed to be non-compliant. *Id.* at PageID#2751.

Even though the Police Department reviewed each of Williams' 36 uses of force during that eight-year period and found no violations of departmental policy,

this does not necessarily preclude a finding of deliberate indifference, especially given the huge statistical disparity between Williams and the other officers. *See, e.g., Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) (holding that, regardless of whether individual claims of police brutality had validity, the sheer number of claims was relevant because it put the City on notice that there was a potential problem).

The case of *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), is also instructive. After a police officer with a history of abusive conduct assaulted Walter Vann during the course of an arrest, Vann filed a § 1983 excessive-force suit against the City based on a failure-to-supervise theory of liability. The district court granted summary judgment in favor of the City, but the Second Circuit reversed.

The officer had been the subject of numerous complaints by civilians and coworkers. He was placed on leave but later restored to full duty. A psychologist found the officer to have a great deal of difficulty adequately handling feelings of anger and resentment and noted that this could lead to the escalation of initially minor situations. He further found that the officer refused to accept responsibility for any of the incidents. *Id.* at 1043. Even though not all of the complaints were substantiated, the psychologist acknowledged that the unusually high number of complaints "could create concern that the officer was experiencing psychological problems and was suffering from stress that caused him to escalate minor situations into major confrontations." *Id.* at 1045. The officer had an established

tendency "to escalate mild altercations into verbal confrontations and ultimately to resort to force." *Id.* at 1046. The court noted that deliberate indifference may be inferred if the municipality makes no meaningful attempt to "forestall further incidents." *Id.* at 1049.

The court held that new complaints against the officer "should have been red-flag warnings" that triggered further review, and that a rational jury could find that there was an obvious need to closely supervise him, that the City was deliberately indifferent, and that the City's actions caused the officer to feel "entitled to compel the 'respect' he demanded through the use of violence." *Id.* at 1050-51.

A reasonable jury could find the same with respect to Officer Williams. Certainly, a reasonable jury could find that the City was aware of Williams' propensity to act unprofessionally and to use force in his interactions with the public. Chief Evers admitted that Williams is an "aggressive" officer. Melvin Tucker has opined that, regardless of the City's findings that all of Williams' previous uses of force were justified, the sheer statistical disparity between the number of times Williams used force over an eight-year period compared to his fellow officers, combined with citizen complaints indicating that he may need additional training in how to de-escalate situations, should have raised red flags and caused the City to take remedial measures. [12]

---

[12] Numerous other incidents included in Williams' personnel file involve allegations of causing damage to vehicles, speeding, failing to follow a supervisor's orders and

Two of Williams' annual performance evaluations note that he needs to practice tolerance and understanding in dealing with difficult behaviors and resolving conflicts. *See* Doc. #140-13, PageID##8597, 8611. It appears that in 2008 and again in 2010, Williams' supervisors considered whether Personnel Early Intervention was warranted, but concluded that there were no "significant incidents" to trigger such any such intervention. *Id.* at PageID##8605, 8592.[13]

In connection with the Lanette Walker incident in 2011, Williams' supervisors found numerous policy violations and recommended a written reprimand. In addition, the captain recommended refresher training and counseling. Doc. #136-11, PageID##3991-92, 3998-4000, 4002-03. Chief Evers, however, found just one policy violation. He imposed only an oral reprimand and ordered Williams to undergo counseling. He did not order any refresher training. Doc. #140-12, PageID##8555-56.

Notably, despite the many incidents documented in Williams' personnel file, this is the *only* time that any form of discipline was imposed on Williams. Plaintiffs suggest that Chief Evers' lenient treatment of Williams is attributable to the fact

---

lying. Doc. #136-9, PageID##3968-72; Doc. #136-13, PageID##4019-20, 4031. These incidents, while problematic, appear to be largely irrelevant to the question of whether the City was deliberately indifferent to Williams' alleged propensity to respond inappropriately in stressful situations like that he confronted with Crawford.

[13]  It is not clear exactly what more would have been required to trigger early intervention.

that Evers is a good friend of Williams' father, who is another long-time employee of the Beavercreek Police Department. Doc. #121, PageID#2449.

Based on all of the foregoing facts, a reasonable jury could find that the City turned a blind eye to an obvious risk that Williams would violate the constitutional rights of those with whom he came into contact and that, in failing to provide additional training on viable alternatives to the use of force, the City was deliberately indifferent.

### Causation

The final element of a failure-to-train or failure-to-supervise claim is causation. Plaintiffs must prove that the inadequate training or supervision was "closely related to or actually caused the injury." *Ellis,* 455 F.3d at 700.

In *Zartner*, the court noted that a sustained pattern of problems that do not result in discipline or correction makes the probability of more violations likely. 242 F. Supp. 3d at 1176. Likewise, in Williams' case, expert witness Melvin Tucker has opined that:

> The failure of the Beavercreek Police Department (B[P]D) to properly supervise Officer Sean Williams by sending him for evaluation, when their own department records showed that Williams had nearly two times as many use of force incidents than any other officer on the Beavercreek Police Department during the time period 2006 through 2013, was causally connected to Williams' unreasonable use of force on August 5, 2014 and the shooting death of John Crawford.

Doc. #162-1, PageID#10489.

In the Court's view, based on the evidence presented, a reasonable jury could find the City's alleged inadequate training and supervision of Officer Williams was causally connected to Crawford's death.

For the reasons set forth above, the Court OVERRULES the Beavercreek Defendants' Motion for Summary Judgment on the § 1983 claims against the City, to the extent that those claims are based on a failure-to-train or failure-to-supervise theory of liability.

### (ii) Ratification

Plaintiffs also argue that the City may be held liable for ratifying Williams' use of deadly force against Crawford, acquiescing in his allegedly unconstitutional conduct. An internal review board found Williams' use of deadly force against Crawford to be legally justified and compliant with departmental policies. Doc. #136, p. 37, 170-71.

Standing alone, the internal review board's finding does not provide an adequate basis for imposing municipal liability. As previously noted, an *after-the-fact approval* of an officer's conduct cannot logically be the *moving force* behind the constitutional violation. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013). *See also Maynard v. Jackson Cty.*, 706 F. Supp. 2d 817, 827–28 (S.D. Ohio 2010) (holding that sheriff's failure to discipline an officer on a single occasion could not be deemed the "moving force" behind the constitutional violation); *Alexander v. Beale St. Blues Co., Inc.*, 108 F. Supp. 2d 934, 949 (W.D.

Tenn. 1999) (dismissing *Monell* claim because "subsequent ratification could not have caused Alexander's death.").[14]

As the court explained in *Alexander*, only in cases where there is a history of similar incidents can ratification "tend to establish the existence of a policy of acquiescence that in itself was a 'moving force." *Id.* For example, in *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), the plaintiff, a paraplegic who was awaiting sentencing at the county jail, alleged that the sheriff was deliberately indifferent to his serious medical needs. The district court found that the sheriff knew or should have known of the plaintiff's deplorable treatment, particularly given the fact that fourteen other paraplegics previously had been treated in a similar manner. The sheriff took no action to correct the problem and did not discipline the employees responsible for the mistreatment. The Sixth Circuit found that "[t]he Sheriff's failure to supervise and correct the situation in view of the numerous similar incidents and his failure subsequently to punish the

---

[14]  In support of this theory of liability, Plaintiffs also cite to *City of St. Louis v. Praprotnick*, 485 U.S. 112 (1988). Their reliance on this case is misplaced. In *Praprotnick*, the Supreme Court rejected the respondent's argument that the City should be held liable for retaliatory employment actions taken against him by his supervisors. At issue was whether the City's final policymakers had delegated policymaking authority over personnel matters to those subordinate supervisors such that the City could be held liable. The Court held that merely deferring to the isolated discretionary decisions made by the subordinates did not constitute a delegation of policymaking authority. *Id.* at 130. Given that Plaintiffs do not allege that Chief Evers delegated policymaking authority concerning the use of deadly force, *Praprotnick* is factually distinguishable.

responsible individuals is more than sufficient evidence of a policy or custom to render the County liable." 891 F.2d at 1248.

In contrast to *Leach*, where there were fourteen previous incidents involving mistreatment of paraplegics at the jail, Plaintiffs have presented evidence of just one other use of deadly force by a Beavercreek police officer — the incident involving Officer Williams' shooting of Scott Brogli. In that case, however, it appears to be undisputed that Williams' use of deadly force was justified, given that Brogli was charging another police officer with a large knife. Accordingly, the Brogli incident does not give rise to an inference that the City had a policy of acquiescing in the unconstitutional use of deadly force.

In the alternative, Plaintiffs argue that the City may be held liable for failing to conduct a meaningful investigation into the alleged unconstitutional conduct herein, effectively ratifying Williams' actions. They allege that the review committee overlooked material inconsistencies in the accounts given by Williams and Darkow. Citing *Wright v. City of Canton*, 138 F. Supp. 2d 955 (N.D. Ohio 2001), Plaintiffs allege that the internal investigation was not designed to discover what actually happened in the seconds preceding the shooting.

In support of this claim, Plaintiffs also cite to *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985). In *Marchese*, the plaintiff-arrestee was beaten by officers before being transported to the jail. Later that night, a deputy opened the door to his cell and allowed someone else to come in to beat him again. The court found that not only was there "official toleration (if not complicity in instigation) of the

60

midnight assault on the part of the command officers on duty at the station house that night[,] but there was also subsequent concealment followed by a complete failure to initiate and conduct any meaningful investigation." 758 F.2d at 187-88. The Sheriffs' failure to conduct an investigation and to punish the wrongdoers "served to confirm the existence of an unstated 'policy' of toleration of illegal brutality." *Id.* at 184.

This case is easily distinguishable. There is no evidence that the City was complicit in the use of deadly force or tried to cover up Crawford's shooting. In fact, the City referred the matter to the Ohio Bureau of Criminal Investigation. Williams' use of deadly force was also closely scrutinized by the United States Department of Justice and presented to a grand jury.

In addition, pursuant to departmental policy, the Beavercreek Police Department conducted its own internal investigation of the incident. Although Plaintiffs disagree with the outcome of that investigation, the facts surrounding it do not give rise to an inference that It "was so inadequate as to constitute a ratification of [the] alleged use of excessive force." *Wright*, 138 F. Supp. 2d at 966. *See also King v. City of Eastpointe*, 86 F. App'x 790, 804 (6th Cir. 2003) (noting that, regardless of whether the outcome of the internal investigation was correct, the City's actions did not support a finding of deliberate indifference required for municipal liability under a ratification theory). In the Court's view, Plaintiffs have failed to present sufficient evidence to sustain a claim of municipal liability based on a ratification theory of liability.

Accordingly, the Court SUSTAINS IN PART and OVERRULES IN PART the Beavercreek Defendants' Motion for Summary Judgment on the § 1983 claims brought against the City. To the extent that Plaintiffs' claims of municipal liability are based on a failure to train or failure to supervise, they may proceed to trial. However, the City is entitled to summary judgment on the claims based on a ratification theory of liability.

### 3. Wrongful Death and Survival Actions (Counts Nine and Ten)

In Count Nine of the Complaint, Plaintiffs seek damages against the Beavercreek Defendants under 42 U.S.C. § 1983 for Crawford's wrongful death and their loss of his services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice. They also seek funeral and burial expenses. In Count Ten, Plaintiffs seek damages against the Beavercreek Defendants under 42 U.S.C. § 1983 for the conscious pain, suffering and emotional distress incurred by Crawford from the beginning of his encounter with Williams and Darkow up to the moment he died.

As the Sixth Circuit explained in *Jaco v. Bloechle*, 739 F.2d 239, 242 (6th Cir. 1984), a wrongful death claim seeks damages sustained by a decedent's family members as a result of his death, whereas a survival claim seeks damages for pain and suffering sustained by the decedent during his lifetime.

The Beavercreek Defendants argue that, because recovery under § 1983 is personal to the individual whose constitutional rights were allegedly violated, Plaintiffs cannot seek recovery under § 1983 for damages *they* suffered as a result

62

of Crawford's death. *See Jaco*, 739 F.2d at 242-43. Plaintiffs concede that dismissal of this portion of the claims is warranted. Accordingly, the Court SUSTAINS Defendants' motion with respect to Count Nine, the wrongful death claim brought under § 1983.

Plaintiffs argue, however, that Tressa Sherrod, as Executrix of Crawford's estate, may bring a survival claim based on violations of Crawford's constitutional rights. The Beavercreek Defendants do not disagree with this. They merely argue that summary judgment is warranted because, for the reasons set forth in their motion for summary judgment, there was no constitutional violation. As previously explained, however, the Court finds that genuine issues of material fact preclude summary judgment on the question of whether Williams violated Crawford's Fourth Amendment right to be free from the use of excessive force and on whether the City may be held liable based on a failure to train/failure to supervise theory. Accordingly, the Court OVERRULES the Beavercreek Defendants' motion for summary judgment on Count Ten, the survival claim.

B. **State Law Claims (Counts One through Seven, Thirteen through Seventeen)**

Plaintiffs also asserted a variety of state law claims against the Beavercreek Defendants: (1) Assault and Battery (Count One), and Negligence, Gross Negligence and Recklessness (Count Two) against Williams and Darkow; (2) Negligent Training and Supervision (Count Three), and Negligence, Gross Negligence and Recklessness (Count Four) against Evers and the City of

Beavercreek; (3) Unreasonable Use of Excessive Force (Count Five), Intentional Infliction of Emotional Distress (Count Six) and Negligent Infliction of Emotional Distress (Count Seven), each against the Beavercreek Defendants; (4) Survivorship and Wrongful Death (Counts Thirteen and Fourteen) against all Defendants; and (5) Loss of Consortium (Counts Fifteen, Sixteen and Seventeen) against all Defendants.

### 1.    Statutory Immunity

The Beavercreek Defendants maintain that they are statutorily immune from liability under Ohio Revised Code Chapter 2744 on all state tort claims, Counts One through Seven.

### a.    City of Beavercreek

Plaintiffs concede that, under Ohio Rev. Code § 2744.02, the City of Beavercreek is statutorily immune from liability for damages on the state law claims. Accordingly, the Court SUSTAINS Defendants' Motion for Summary Judgment on Plaintiffs' claims *against the City* on Counts Three, Four, Five, Six and Seven.

### b.    Chief Evers, Sergeant Darkow and Officer Williams

Plaintiffs, however, argue that Williams, Darkow and Evers, who are all employees of the City of Beavercreek, are not statutorily immune from liability for damages on Counts One through Seven. Ohio Revised Code § 2744.03(A)(6) governs liability of employees of political subdivisions. It provides immunity from liability unless:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or
(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6).

Subsection (b) is the only one potentially applicable here. To overcome immunity, Plaintiffs must prove that the employees acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result" and "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 2012-Ohio-5711, ¶¶ 33-34, 134 Ohio St. 3d 380, 388, 983 N.E.2d 266, 273.

The statutory immunity of Sergeant Darkow and Officer Williams is closely tied to the § 1983 claims. As the Sixth Circuit has noted, if plaintiffs cannot demonstrate that the officers' use of force was objectively unreasonable, they cannot show that the officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009).

Based on the evidence presented, no reasonable jury could find that Sergeant Darkow acted with malice, in bad faith or in a wanton or reckless manner. He simply told Crawford to drop the gun. He is therefore entitled to statutory immunity on all of the state law claims asserted against him.

The Court finds, however, that the same genuine issues of material fact that preclude summary judgment on the § 1983 excessive force claims against Officer Williams also preclude summary judgment on the question of his statutory immunity on each of the state law claims asserted against him. *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) ("resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive force determination under § 1983.").

Chief Evers also argues that he is entitled to statutory immunity on Counts Three through Seven because Plaintiffs cannot point to any evidence supporting a finding that he acted with malicious purpose, in bad faith, or in a wanton or reckless manner. In the Court's view, although Chief Evers is entitled to qualified immunity on the § 1983 claims based on his lack of personal involvement in Crawford's shooting, he is not necessarily entitled to statutory immunity on the state law claims. Based on the evidence presented as discussed above, a reasonable jury could find that he was *reckless* in his failure to adequately train and supervise Officer Williams. Accordingly, the Court finds that genuine issues of material fact preclude a finding of statutory immunity in his favor at this juncture.

## 2.    Merits of State Law Claims

The Beavercreek Defendants further argue that, even if statutory immunity is not available, no reasonable jury could find in Plaintiffs' favor on the claims of Assault and Battery, Intentional Infliction of Emotional Distress, or Negligent Infliction of Emotional Distress. Plaintiffs, on the other hand, argue that because there are no genuine issues of material fact with respect to the § 1983 claim asserted against Officer Williams, they are also entitled to summary judgment on the state law claims of Battery, Intentional Infliction of Emotional Distress, Survivorship and Wrongful Death asserted against him. For the sake of completeness, the Court will touch on each of the state law claims asserted by Plaintiffs.

### a.    Assault and Battery (Count I)

Count One of the Complaint asserts a claim of Assault and Battery against Williams and Darkow; however, the Court has already determined that Darkow is entitled to statutory immunity. Williams argues that, under Ohio law, police officers are privileged to commit battery when making lawful arrest. He acknowledges, however, that the privilege is negated by the use of excessive force. Accordingly, such a claim typically rises or falls with the § 1983 excessive force claim. *D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003).

As with the § 1983 excessive force claim, Plaintiffs and Williams each claim to be entitled to summary judgment on this state law claim. As explained above, the Court finds that genuine issues of material fact preclude summary judgment in

favor of *either* party on the § 1983 excessive force claim against Williams.

Accordingly, the Court OVERRULES both parties' motions for summary judgment on Count One.

### b. Negligence, Gross Negligence and Recklessness (Count Two and Four); Negligent Training and Supervision (Count Three)

Although the Beavercreek Defendants have not moved for summary judgment on the merits of Counts Two, Three or Four, it is clear that the scope of these claims is limited by the doctrine of statutory immunity.

Count Two of the Complaint asserts a claim of negligence, gross negligence and recklessness against Williams and Darkow. Again, the Court has already determined that Darkow is entitled to statutory immunity. To the extent that Plaintiffs' claims against Williams are grounded in negligence or gross negligence, they are subject to dismissal because Ohio Revised Code § 2744.03 requires a higher level of culpability to overcome statutory immunity. *See Piro v. Franklin Twp.*, 102 Ohio App. 3d 130, 143, 656 N.E.2d 1035, 1043 (9th Dist. 1995); *Tuleta v. Medical Mut. of Ohio*, 2014-Ohio-396, 6 N.E.3d 106, ¶ 58 (8th Dist.). However, to the extent that Plaintiffs argue that Williams acted recklessly and/or intentionally in failing to assess the information provided by the 911 dispatcher and in failing to give Crawford time to comply with Darkow's commands, this claim survives summary judgment for reasons previously stated.

68

To the extent that Count Three asserts only a claim of *negligent* training and supervision against Chief Evers, he is entitled to statutory immunity on this claim. Accordingly, the Court dismisses Count Three in its entirety.

Count Four alleges that the conduct of Chief Evers, in failing to properly train and supervise Officer Williams, constitutes negligence, gross negligence and recklessness. Again, to the extent that this claim is grounded in negligence or gross negligence, Evers is entitled to statutory immunity. However, to the extent it is grounded in recklessness, it may proceed for the reasons previously set forth.

### c. Unreasonable Use of Excessive Force (Count Five)

Count Five of the Complaint asserts a state law claim of unreasonable use of excessive force against the Beavercreek Defendants. This claim is closely tied to the § 1983 excessive force claim and to the state law claim of Assault and Battery. Sergeant Darkow is entitled to statutory immunity, but, for reasons previously stated, Plaintiffs may proceed on this claim against Officer Williams. Because Chief Evers did not use any force against Crawford, he is entitled to summary judgment on this claim.

### d. Intentional Infliction of Emotional Distress (Count Six)

Count Six of the Complaint asserts a claim of intentional infliction of emotional distress against the Beavercreek Defendants. To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove:

a) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; b) that the actor's conduct was

69

extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; c) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and d) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Pyle v. Pyle*, 11 Ohio App. 3d 31, 463 N.E.2d 98 (8th Dist. 1983), ¶ two of the syllabus.

As with the Assault and Battery count, Plaintiffs and the Beavercreek Defendants have all moved for summary judgment on this claim. Plaintiffs argue that because summary judgment is appropriate on the § 1983 claims against Williams, summary judgment should be granted in their favor on this claim of intentional infliction of emotional distress as well. The Beavercreek Defendants argue that, based on the evidence presented, no reasonable jury could find that Officer Williams' conduct was "extreme and outrageous."

Again, genuine issues of material fact preclude summary judgment in favor of either Plaintiffs or Officer Williams. When the evidence is viewed in the light most favorable to Plaintiffs and all reasonable inferences are resolved in their favor, a reasonable jury could find that Officer Williams' conduct "was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community." *Id.* When the evidence is viewed in the light most favorable to Williams and all reasonable inferences are resolved in his favor, a reasonable jury could also find, however, that, based on the totality of the circumstances, Williams' conduct failed to rise to this level.

Chief Evers, however, is entitled to summary judgment on this claim. Assuming *arguendo* that he failed to properly train and supervise Officer Williams, no reasonable jury could find, based on the evidence presented, that Evers' conduct was "extreme and outrageous," that it "went beyond all possible bounds of decency," or that it "can be considered as utterly intolerable in a civilized community." Accordingly, the Court sustains Chief Evers' motion for summary judgment on this claim.

### e. Negligent Infliction of Emotional Distress (Count Seven)

Count Seven of the Complaint asserts a claim of negligent infliction of emotional distress against the Beavercreek Defendants. Defendants argue that, because such a claim, by its very definition, is premised on *negligent* conduct, it is subject to dismissal under Ohio Revised Code § 2744.03, which requires a higher level of culpability to overcome statutory immunity. *See Piro v. Franklin Twp.*, 102 Ohio App. 3d 130, 143, 656 N.E.2d 1035, 1043 (9th Dist. 1995); *Tuleta v. Medical Mut. of Ohio*, 2014-Ohio-396, 6 N.E.3d 106, ¶ 58 (8th Dist.).

Plaintiffs concede that this is a correct statement of the law. Doc. #164, PageID#10845 n.16. Accordingly, the Court SUSTAINS the Beavercreek Defendants' Motion for Summary Judgment with respect to Count Seven.

### f. Survivorship (Count Thirteen)

In Count Thirteen, Plaintiffs allege that, prior to his death, Crawford endured conscious pain and suffering, anxiety and fright as a result of this incident. Both parties have moved for summary judgment on this claim.

Under Ohio Rev. Code § 2305.21, this claim survives his death and may be brought by his estate. "Survivorship is a claim that is derivative of the principal claims in a complaint," and it "remains so long as any of the underlying principal claims in the complaint remain." *Stratford v. SmithKline Beecham Corp.*, No. 2:07-CV-639, 2008 WL 2491965, at *9 (S.D. Ohio June 17, 2008).

Given that the Court has denied summary judgment on some of the principal claims, the Court OVERRULES both parties' motions for summary judgment on Count Thirteen as well.

### g. Wrongful Death (Count Fourteen)

In Count Fourteen of the Complaint, Plaintiffs seeks damages under Ohio Rev. Code § 2125.01 for Crawford's wrongful death, for his funeral and burial expenses, and "for their loss of his services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice; for their grief, depression and severe emotional distress." Doc. #1, PageID#23.

With respect to the claims brought by Crawford's *relatives*, the Beavercreek Defendants argue that no such claim is permissible. The wrongful death statute provides that "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent . . . " Ohio Rev. Code § 2125.02(A)(1). Plaintiffs do not address this argument, impliedly conceding its merit. Accordingly, the Beavercreek Defendants are entitled to summary judgment on this portion of the claim.

Both parties have moved for summary judgment on the wrongful death claim

brought by Executrix Tressa Sherrod. The Beavercreek Defendants note that a

wrongful death claim must be predicated on a separate tort. *Beyoglides v.*

*Montgomery Cty. Sheriff*, No. 3:14-cv-158, 2016 WL 8669789, at *1 (S.D. Ohio

Aug. 12, 2016). Given the Court's finding that genuine issues of material fact

preclude summary judgment on at least some of the state law tort claims asserted

by Plaintiffs, the Court likewise OVERRULES both parties' motions for summary

judgment on Count Fourteen to the extent that it is brought by Executrix Tressa

Sherrod.

### h. Loss of Consortium (Counts Fifteen, Sixteen and Seventeen)

In Counts Fifteen, Sixteen and Seventeen, John Crawford, Jr. (Crawford's

father), and LeeCee Johnson (as next friend and guardian of Crawford's two minor

sons) seek damages for loss of consortium. This cause of action is derivative,

dependent on the existence of a primary cause of action. *Messmore v. Monarch*

*Mach. Tool Co.*, 11 Ohio App. 3d 67, 68-69, 463 N.E.2d 108 (9th Dist. 1983).

Given the Court's finding that genuine issues of material fact preclude

summary judgment on some of Plaintiffs' claims, the Court OVERRULES the

Beavercreek Defendants' motion for summary judgment on Counts Fifteen, Sixteen

and Seventeen.

### 3.    Punitive Damages

The Beavercreek Defendants also ask the Court to dismiss Plaintiffs' claims for punitive damages. Plaintiffs concede that punitive damages are not available against the City under § 1983 or under state law. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 n.21 (1981); Ohio Rev. Code § 2744.05(A).

With respect to the § 1983 claims asserted against Williams in his individual capacity, Plaintiffs must prove that he acted with an evil motive or callous indifference to a federally protected right. *Smith v. Wade*, 461 U.S. 30, 56 (1983). To recover punitive damages on the state law claims asserted against Williams and Evers, Plaintiffs must prove that Defendants acted with actual malice, *i.e.*, either with "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336, 512 N.E.2d 1174, 1176 (1987).

In the Court's view, based on the evidence presented, the Court finds that a reasonable jury could find that Officer Williams acted with callous indifference to a federally protected right or with a conscious disregard for John Crawford's rights and safety. Accordingly, the Court OVERRULES the Beavercreek Defendants'

motion for summary judgment with respect to the punitive damages claims asserted against Officer Williams.[15]

However, the Court SUSTAINS the motion with respect to the punitive damages claims asserted against Chief Evers. Based on the evidence presented, no reasonable jury could find that he acted with actual malice in his training or supervision of Officer Williams.

## IV.    Conclusion

For the reasons set forth above, the Court SUSTAINS IN PART AND OVERRULES IN PART the Motion for Summary Judgment of Defendants Officer Sean C. Williams, Sgt. David M. Darkow, Chief Dennis Evers, and the City of Beavercreek, Ohio (Doc. #129). The Court dismisses with prejudice all claims against Sergeant David Darkow.

The Court OVERRULES Plaintiffs' Motion for Partial Summary Judgment (Doc. #169). Plaintiffs are DIRECTED to Show Cause within 10 Days why the § 1983 claims based on alleged violations of Crawford's Fifth, Sixth and Eighth Amendment rights should not be dismissed with prejudice.

At this juncture, as to claims asserted against the Beavercreek Defendants, the following claims survive for trial:

---

[15]    Plaintiffs concede that punitive damages are not available on Count Sixteen, the wrongful death claim. *See Rubeck v. Huffman*, 54 Ohio St. 2d 20, 22-23, 374 N.E.2d 411, 413 (1978).

Against Officer Sean Williams in his individual capacity:

- Count One (Assault and Battery Under Ohio Law)
- Count Two (Recklessness Under Ohio Law)
- Count Five (Excessive Force Under Ohio Law)
- Count Six (Intentional Infliction of Emotional Distress Under Ohio Law)
- Count Eight (§ 1983 Fourth Amendment Violation)
- Count Ten (§ 1983 Survival)
- Count Thirteen (Survivorship Under Ohio Law)
- Count Fourteen (Wrongful Death Under Ohio Law)
- Counts Fifteen, Sixteen and Seventeen (Loss of Consortium Under Ohio Law)
- Punitive Damages

Against Chief Dennis Evers in his individual capacity:

- Count Four (Recklessness Under Ohio Law)
- Count Thirteen (Survivorship Under Ohio Law)
- Count Fourteen (Wrongful Death Under Ohio Law)
- Counts Fifteen, Sixteen and Seventeen (Loss of Consortium Under Ohio Law)

Against City of Beavercreek:

- Count Eight (§ 1983 Failure to Train/Failure to Supervise)
- Count Ten (§ 1983 Survival)

Date: January 15, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

76